**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| YAN DU, ET AL., individually and on behalf of all others similarly situated<br>    *Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET AL.<br>    *Defendants*. | 3:25-cv-644 (OAW) |

## ORDER GRANTING TEMPORARY RESTRAINING ORDER

Plaintiffs Yan Du, Elika Shams, Mengni He, and Stephen Azu are international students affiliated with either the University of Connecticut ("UConn") or Yale University whose F-1 statuses were terminated on the Student and Exchange Visitor Information System ("SEVIS") without notice or explanation in March or April 2025. Compl. ¶¶ 1–2, ECF No. 1. On April 24, 2025, Plaintiffs filed a complaint against the United States Department of Homeland Security ("DHS"), Secretary of the Department of Homeland Security Kristi Noem, and Acting Director of Immigration and Customs Enforcement ("ICE") Todd Lyons (together "Defendants") on behalf of themselves and at least 53 similarly situated individuals (the "putative class"). *Id.* On the same day, they filed a motion for injunctive relief, seeking the restoration of the plaintiffs' and putative class members' F-1 status until the court issues a final judgment on the merits. Pls.' Mot. for TRO 1, ECF No. 2 ("Mot. for TRO").

For the reasons discussed herein, the court **GRANTS a TEMPORARY RESTRAINING ORDER** as to the named Plaintiffs and withholds judgment on injunctive relief for members of the putative class.

1

I.  **BACKGROUND**

Plaintiffs are nonimmigrant[1] students who, up until early April, lawfully studied or worked at Connecticut universities through the F-1 program.[2] Compl. ¶¶ 1–2. The F-1 program gives international students valid immigration status to complete a "full course of study" at an approved academic institution in the United States ("F-1 status"). *See id.* ¶¶ 17–18; 8 U.S.C. § 1101(a)(15)(F)(i). F-1 status lasts as long as the student is pursuing an academic program at an approved institution or engaging in authorized practical training following completion of studies. *See* 8 C.F.R. § 214.2(f)(5)(i). To maintain F-1 status, students must comply with the requirements of their visa classification under 8 C.F.R. § 214.2(f), though F-1 status is not to be confused with an F-1 visa.[3] Compl. ¶¶ 25–28.

Students may lose F-1 status in one of two ways: failing to maintain their status, or specific action by the government to terminate their status. When an international student loses F-1 status, the government may detain and deport them. 8 U.S.C. § 1227(a)(1)(C) ("Any alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted . . . is deportable.").

---

[1] A nonimmigrant is an individual who has "a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study." 8 U.S.C. § 1101(a)(15)(F)(i).

[2] Plaintiff Stephen Azu, a citizen of Ghana, is a researcher in the Goldenson Center for Actuarial Science at UConn. Mot. for TRO at 13. Plaintiffs Yan Du and Mengni He are Chinese nationals pursuing Ph.Ds in Chemical and Environmental Engineering and Experimental Pathology, respectively, at Yale University. *Id.* at 8–12. Plaintiff Elika Shams, a citizen of Iran, is pursuing a Ph.D in biomedical engineering at UConn. *Id.* at 10.

[3] "The F-1 student visa refers only to the document that nonimmigrant students receive to enter the United States, whereas F-1 student status refers to the students' formal immigration classification once they enter the country." *Jane Doe 1, et al. v. Pam Bondi, et al.*, No. 1:25-CV-01998-VMC, 2025 WL 1188469, at *2 (N.D. Ga. Apr. 18, 2025). A student's F-1 visa may be revoked, but they can remain in the United States lawfully because they have F-1 status. Mot. for TRO at 4–5 (citing 22 C.F.R. § 41.122). If they were to leave the country, however, they would not be able to return. *See id.*

The Department of Homeland Security monitors and enforces the F-1 program. *See* SEVP Overview, https://www.ice.gov/sevis (last visited April 28, 2025). It uses the Student and Exchange Visitor Information System ("SEVIS"), which is a centralized database maintained by DHS and universities to track students' compliance with their program requirements. *See* Student and Exchange Visitor Information System, https://www.ice.gov/sevis/overview (last visited April 28, 2025).

In early April, Yale and UConn informed Plaintiffs that their F-1 statuses were terminated on SEVIS. Email to Du, Ex. 6, ECF No. 2-6; Email to Shams, Ex. 9, ECF No. 2-9; Email to He, Ex. 12, ECF No. 2-12; Email to Azu, Ex. 15, ECF No. 2-15. The reason reported for each termination was "OTHER: Individual identified in criminal records check and/or has had their VISA revoked."[4] Mot. for TRO at 15. Plaintiffs did not receive notice or an explanation from DHS as to why their status was terminated. *Id.* at 3. None of the Plaintiffs has been convicted of a crime that would warrant the termination of their F-1 status.[5] Plaintiffs are unaware of any valid reasons for a change in their immigration status. *See id.* at 8–15.

On April 24, 2025, the plaintiffs filed a complaint on grounds that Defendants violated the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment to the United States Constitution. Compl. ¶¶ 97–103. Along with the

---

[4] Plaintiffs claim that "only the government" can enter this termination reason when eliminating a student's SEVIS record. Mot. for TRO at 15–16.

[5] Plaintiff Shams had a prior F-1 student visa canceled by Customs and Border Patrol based on a misunderstanding that was later resolved. Compl. ¶ 54. In 2024, she was issued a warning from TSA after she got into a dispute with a Frontier Airlines staff member (Frontier later issued her an apology). *Id.* ¶ 55. Plaintiff He received a non-criminal traffic violation in 2016. *Id.* ¶ 69. Around that time, her visa was revoked, though it was later reinstated. *Id.* ¶ 70. Plaintiff Azu has received three traffic violations since 2022, including one speeding and one parking ticket. *Id.* ¶¶ 80–81. In 2022, Plaintiff Du's F-1 status was mistakenly terminated due to a miscommunication with Yale, though it was restored by the end of the year. *Id.* ¶ 40.

complaint and the motion for injunctive relief currently under consideration, they also filed an Emergency Motion to Certify a Class under Federal Rule of Civil Procedure 23(b)(2). Pls.' Emergency Mot. for Class Certification, ECF No. 3 ("Class Cert.").

Plaintiffs claim that Defendants terminated their F-1 status "without warning, notice, meaningful explanation, or the ability to be heard," and that the terminations themselves are unconstitutional and unlawful. Mot. for TRO at 3.

## II. **LEGAL STANDARD**

A court may issue an ex parte TRO under Federal Rule of Civil Procedure 65(b), if the plaintiff shows: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[6] *See New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979) (reminding district courts "to observe scrupulously the requirements of Rule 65(b)," when weighing ex parte TROs). The balance of equities and public interest elements merge where, as here, the government is sued. *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020). The United States Court of Appeals for the Second Circuit repeatedly has emphasized that the "single most important prerequisite" to issuing a TRO is the showing of irreparable harm. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).

---

[6] In the Second Circuit, "[t]he same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order." *See Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 218 (D. Conn. 2020).

4

While an ex parte TRO is an extraordinary remedy, it is "indispensable" in certain circumstances. *Matter of Vuitton et Fils S.A.*, 606 F.2d at 4. When reviewing a TRO application, a court may consider "the entire record including affidavits and other hearsay evidence." *See J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) (internal citation omitted).

### III. DISCUSSION

#### A. Irreparable Harm

To demonstrate irreparable harm, a plaintiff must show that absent injunctive relief, they will suffer "an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotations and citations omitted). Irreparable harm is the "single most important prerequisite" to injunctive relief. *Id.*

Plaintiffs surely will suffer irreparable harm absent injunctive relief. First, Plaintiffs are in immediate danger of deportation. Second, by terminating their status, Defendants have put Plaintiffs in a catch-22: if they pursue their coursework and employment, they will violate the terms of the F-1 program by engaging in unauthorized activity. If they do not, they will violate the terms of the F-1 program by failing to meet their academic or employment obligations. Mot. for TRO at 20–21.

To the first point, Defendants' termination of Plaintiffs' F-1 status on SEVIS puts the latter group in immediate danger of deportation because it calls into question the legal basis for their presence in the United States. 8 U.S.C. § 1227(a)(1)(C)(i) ("Any

5

alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted . . . is deportable."). In the past, DHS has instructed students whose SEVIS records were terminated that they "no longer have valid F-1 nonimmigrant status and must either file for reinstatement of [their] nonimmigrant student status with U.S. Citizenship and Immigration Services (USCIS) or depart the United States immediately." *Jie Fang v. Dir. United States Immigr. & Customs Enf't*, 935 F.3d 172, 177 (3d Cir. 2019). Other courts reviewing claims from similarly situated international students have drawn the same conclusion. *See, e.g.*, *W. B. v. Noem, et al.*, No. 25-CV-03407-EMC, 2025 WL 1180296, at *3 (N.D. Cal. Apr. 23, 2025) ("SEVIS termination has real-world legal consequences . . . having a legal effect upon Plaintiff's F-1 status, F-1 visa, I-20 status, and her ability to apply for an H-1B visa."); *B K, et al. v. Noem, et al.*, No. 1:25-CV-419, 2025 WL 1171572, at *8 (W.D. Mich. Apr. 23, 2025) (rejecting argument that plaintiffs with terminated SEVIS records faced a "merely 'speculative'" risk of deportation).

Nor is deportation of international students a speculative or uncertain threat. *See* Nate Raymond, *Trump administration detains Turkish student at Tufts, revokes visa*, REUTERS, Mar. 27, 2025, (available at: https://www.reuters.com/world/us/tufts-says-international-student-taken-into-us-custody-visa-revoked-2025-03-26/) (last visited Apr. 28, 2025). In the aftermath of her status termination, Plaintiff Shams was advised by UConn to contact an immigration attorney and designate a point of contact, "in the event [she is] unavailable," presumably acknowledging her possible detention by immigration authorities. *See* Email to Shams 1–2, Ex. 9, ECF No. 2-9. Plaintiff Azu was advised by the U.S. Consulate in Accra that his visa had been revoked and that "[p]ersons being

6

deported may be sent to countries other than their countries of origin." Consulate Email 1, Ex. 16, ECF No. 2-16.

The specter of deportation means Plaintiffs are "lying low," afraid to "go to the lab, to class," or even to the grocery store. Mot. for TRO at 21–22. Their anxiety and fear, as well as the disruption that detention and deportation pose to their personal, academic, and professional pursuits constitute irreparable harm. *See, e.g.*, *Doe 1 v. Bondi*, No. 1:25-CV-01998-VMC, 2025 WL 1188469, at *4 (N.D. Ga. Apr. 18, 2025) (finding the threat of deportation to students whose F-1 status was terminated constituted irreparable harm); *Ratsantiboon v. Noem*, No. 25-CV-01315 (JMB/JFD), 2025 WL 1118645, at *2 (D. Minn. Apr. 15, 2025) (finding that termination of the plaintiff's SEVIS record "forces him to live in uncertain legal status while he pursues this matter" which constitutes an irreparable harm (internal citation omitted)).

Second, Defendants have placed Plaintiffs in a position whereby any action— short of leaving the country (and accepting the consequences therefrom)— will violate federal immigration regulations. If Plaintiffs pursue coursework and employment without F-1 status on SEVIS, they violate federal immigration regulations.[7] But if they do not, they risk noncompliance with their obligations under the F-1 program.

For example, UConn told Plaintiff Shams that she "may not engage in UConn academic activity" while her SEVIS record "is in terminated status." Rae Email, Ex. 10, ECF No. 2-10. Specifically, she may not access coursework or otherwise "actively engage in academic work for [her] degree program." *Id.* This is in direct conflict with

---

[7] UConn instructed Plaintiff Shams to "STOP WORKING" because "any prior work authorization/eligibility has ended." Email to Shams, Ex. 9, ECF No. 2-9. They also told Plaintiff Azu to stop working because his F-1 status was terminated on SEVIS. Mot. for TRO at 15. Plaintiff He is "not permitted to continue her research" at Yale, nor can she receive her doctoral stipend—her only source of income. *Id.* at 13.

7

Plaintiff Shams's obligations to make "normal progress toward completing a course of study," in order to maintain her status in the F-1 program.  8 C.F.R. § 214.2(f)(5)(i).

Each plaintiff faces this conundrum, and the attendant harm cannot be remedied by the court upon conclusion of this case, nor via mere money damages.  "The loss of timely academic progress alone is sufficient to establish irreparable harm."  *Doe 1 v. Bondi*, 2025 WL 1188469, at *4.  And forcing Plaintiffs out of compliance with the F-1 program—even by mistake—jeopardizes their ability to stay in the United States.  *W. B. v. Noem, et al.*, No. 25-CV-03407-EMC, 2025 WL 1180296, at *4 (N.D. Cal. Apr. 23, 2025) (finding irreparable harm where termination of the plaintiff's F-1 status affected her "future ability to remain in the United States").

In sum, Plaintiffs have demonstrated they will continue to suffer irreparable harm absent immediate injunctive relief which restores their F-1 status on SEVIS.

### B. Likelihood of Success on the Merits

The court also must consider whether Plaintiffs are likely to prevail on the merits, or whether they at least raise "sufficiently serious questions going to the merits" of their claim.  *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004).  Here, Plaintiffs have raised serious questions about whether Defendants violated the APA by terminating SEVIS records without a lawful basis.

First, Plaintiffs argue that 8 C.F.R. § 214.1(d) restricts Defendants' ability to terminate F-1 status outside certain limited circumstances.[8]  Mot. for TRO at 27.

---

[8] Under 8 C.F.R. § 214.1(d), DHS is permitted terminate F-1 status in the following circumstances: (1) by the revocation of a waiver authorized on the student's behalf under section 212(d)(3) or (4) of the Immigration and Nationality Act; (2) by the introduction of a private bill to confer permanent resident status on such person; or, (3) pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.

8

Indeed, other courts have suggested the same. *See Jie Fang*, 935 F.3d at 185 n.100 ("the ability to terminate an F-1 visa is limited by § 214.1(d)"); *see also Doe 1 v. Bondi*, 2025 WL 1188469, at *3 (concluding "Plaintiffs are likely to show that Defendants' termination of their F-1 status was not in compliance with 8 C.F.R. § 214.1(d)"). Here, there is no record suggesting that Defendants complied with § 214.1(d), nor is there reason to conclude Plaintiffs otherwise failed to maintain their F-1 statuses. Accordingly, the court finds that there are serious questions as to whether Defendants acted with statutory authority.

Next, Plaintiffs argue that Defendants' actions violated the APA, thus the F-1 status terminations are subject to judicial review. Compl. ¶ 98. Under the APA, individuals "suffering legal wrong because of agency action" are entitled to judicial review, 5 U.S.C. § 702, provided that the action in question is "final agency action," 5 U.S.C. § 704.[9] Final agency action marks the "consummation" of the agency's decision-making process. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). It is an action from which "legal consequences flow." *Id.*

The crux of the matter is whether Defendants' termination of Plaintiffs' F-1 status on SEVIS constitutes a final agency action. Numerous courts adjudicating similar TRO applications either have found it is a final agency action, or that this inquiry raises serious questions going to the merits of claims against the government. *See Patel v. Bondi*, No. 1:25-CV-00101, 2025 WL 1134875, at *2 (W.D. Pa. Apr. 17, 2025) (finding "[t]he SEVIS termination is a final agency decision susceptible to judicial review"); *W. B. v. Noem, et al.*, 2025 WL 1180296, at *4 (finding that termination of F-1 status likely is a

---

[9] In the text of the APA, a final agency action is one "for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

9

final agency action); *see Doe 1 v. Bondi*, 2025 WL 1188469, at *3 ("Termination of the SEVIS registration constitutes a final decision reviewable under the APA"); *see Hinge, v. Lyons*, No. CV 25-1097 (RBW), 2025 WL 1134966, at *5 (D.D.C. Apr. 15, 2025) ("the Court cannot determine on the current record whether final agency action has occurred"); *see also Jie Fang*, 935 F.3d at 182 ("The order terminating these students' F-1 visas marked the consummation of the agency's decisionmaking process, and is therefore a final order"); *see also Fang v. Director U.S. Immigration & Customs Enforcement*, 935 F.3d 172, 185 (3rd Cir. 2019) (finding that an order terminating F-1 status was a final agency action for jurisdictional purposes).

Thus, the court concludes that Plaintiffs have raised sufficiently serious questions going to the merits of their APA claim that Defendants' actions were not authorized by statute and must be set aside pursuant to 5 U.S.C. § 706(2)(A).

### C. Balance of Equities & Public Interest

Finally, the court considers whether the balance of equities and the public interest weigh in favor of granting injunctive relief. *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020).

The public interest weighs in favor of injunctive relief because it is in the public interest to ensure executive agencies follow immigration laws. "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotations and citation omitted). Moreover, it is in the public interest to ensure that graduate students who have invested

time, money, and effort at Connecticut universities can obtain their degrees without facing arbitrary, drastic obstacles. *See Yang v. Noem*, No. 25-CV-292-WMC, 2025 WL 1166521, at *5 (W.D. Wis. Apr. 22, 2025) ("[T]he public, which includes the taxpayers of the State of Wisconsin, has an overriding interest in seeing that students at the University of Wisconsin are able to be educated and obtain degrees earned with both sweat equity and tuition payments, unless there is a good reason to deny either.").

Additionally, the balance of equities weighs heavily in the plaintiffs' favor. Plaintiffs Du, Shams, He, and Azu stand to lose their lawful status, their liberty, and their academic and professional opportunities. By contrast, temporary injunctive relief will impose a minimal burden on Defendants. While Defendants have not yet appeared, DHS has argued in similar cases that the balance of equities weigh in favor of the Executive Branch's control over immigration. *Doe 1 v. Bondi*, 2025 WL 1188469, at *3; *cf. B K, et al. v. Noem, et al.*, 2025 WL 1171572, at *8. Here, the court is skeptical that the Executive's ability to enforce immigration laws will be disrupted by reinstituting Plaintiffs' F-1 status on SEVIS. In fact, doing so may help uphold those laws.

For the foregoing reasons, the court finds the factors required for a TRO have been satisfied. And while curative action might have been taken by Defendants,[10] there is not yet record evidence of the same. As such, the court hereby schedules a hearing to determine whether the TRO should be converted into a preliminary injunction.

---

[10] *See, e.g.*, Yolanda Wang, *Immigration Status Records Restored for Four Yale Students*, YALE DAILY NEWS, Apr. 27, 2025 (available at: https://yaledailynews.com/blog/2025/04/27/immigration-status-records-restored-for-four-yale-students/) (last visited Apr. 28, 2025); Zach Montague and Hamed Aleaziz, *U.S. Restores Legal Status for Many International Students, but Warns of Removals to Come*, N.Y. TIMES, Apr. 25, 2025 (available at: https://www.nytimes.com/2025/04/25/us/politics/trump-student-visa-cancellations.html) (last visited Apr. 28, 2025); Erik Larson and Bob Van Voris, *Trump Administration Backtracks on Revoking Student Visas (1)*, BLOOMBERG LAW, Apr. 25, 2025 (available at: https://www.bloomberglaw.com/product/blaw/bloomberglawnews/us-law-week/X87A3LCO000000) (last visited Apr. 28, 2025).

IV. **CONCLUSION**

For the reasons discussed herein, it is **ORDERED:**

1. Plaintiffs' Motion for Temporary Restraining Order (ECF No. 2) is **GRANTED** as to Plaintiffs Yan Du, Elika Shams, Mengni He, and Stephen Azu.

    a. Defendants shall reinstate Plaintiffs' F-1 status on SEVIS, consistent with their status before termination in March or April 2025.

    b. Reinstatement shall be retroactive to the date of termination.

    c. Defendants are temporarily enjoined from taking any further action to terminate the plaintiffs' F-1 status.

    d. Defendants, their officers, agents, servants, employees, attorneys, and all persons acting in concert with them, hereby are enjoined from removing any Plaintiffs from the District of Connecticut, and from deporting them from the United States, on grounds stemming from the termination of their F-1 status on SEVIS.

2. The court exercises its discretion to waive the bond requirement set forth in Rule 65(c) of the Federal Rules of Civil Procedure at this time.

3. A hearing will be held in Courtroom 2, 450 Main Street, Hartford, Connecticut, on **Tuesday, May 13, 2025, at 10:00 A.M.,** at which Defendants may show cause why the TRO should not be converted into a preliminary injunction.

**IT IS SO ORDERED** in Hartford, Connecticut, this 28th day of April, 2025.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE
