1               UNITED STATES DISTRICT COURT

2                  DISTRICT OF CONNECTICUT
  - - - - - - - - - - - - - - - -x
3
  YAN DU, et al                    :
4                                  : Case No. 3:25cr644-OAW
  v.                               :
5                                  :
                                   :
6 UNITED STATES DEPARTMENT         :
  OF HOMELAND SECURITY, et al      :        MAY 16, 2025
7                                  :
                                   :          HEARING
8                                  :
  - - - - - - - - - - - - - - - - x
9

10

11                 SHOW CAUSE HEARING

12

13                  450 Main Street
                  Hartford, CT 06103
14

15

16        BEFORE: THE HONORABLE OMAR A. WILLIAMS

17

18

19

20

21

22 COURT REPORTER:  Catherine Cullen
                   (914) 552-3201
23

24 Proceedings recorded by mechanical stenography; transcript
   produced by computer.
25

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4    AMERICAN CIVIL LIBERTIES UNION - Connecticut
      765 Asylum Avenue, First floor
 5    Hartford, Connecticut 06105
      BY: DAN BARRETT
 6              -and-

 7    ACLU FOUNDATION OF CONNECTICUT
      765 Asylum Avenue, First floor
 8    Hartford, Connecticut 06105
      By: ELANA SPUNGEN-BILDNER
 9        JACLYN MARIE BLICKLEY

10              -and-

11    LLINAS LAW, LLC
      553 Portland-Cobalt Road, Unit Two
12    Portland, Connecticut 06480-1968
      BY:  JAMES CHRISTOPHER LLINAS
13

14    FOR THE DEFENDANT:

15    UNITED STATES ATTORNEY'S OFFICE
      157 Church Street, 25th floor
16    New Haven, Connecticut 06510
      BY:  MICHELLE LYNN MCCONAGHY
17        JOHN LARSON

18

19

20

21

22

23

24

25
```

```
1              COURTROOM DEPUTY:  (Opens the courtroom).

2              THE COURT:  You may be seated.  Good morning,

3    everybody.

4              MS. MCCONAGHY:  Good morning, Your Honor.

5              MS. BILDNER:  Good morning.

6              THE COURT:  We are here for a show cause hearing

7    in Yan Du, et al versus United States Department of

8    Homeland Security, et al.  The docket number is 25cv644.

9              Would the parties identify themselves for the

10   record, starting with the plaintiff, please.

11             MS. BILDNER:  Good morning, Your Honor.  My name

12   is Elana Bildner.  I'm from the ACLU Foundation of

13   Connecticut, and I'm accompanied by my colleagues, which

14   I'll let them introduce themselves.

15             MS. BLICKLEY:  Good morning, Your Honor.  Jaclyn

16   Blickley for the plaintiffs.

17             MR. LLINAS:  Jay Chris Llinas on behalf of the

18   plaintiffs.

19             THE COURT:  Thank you so much.  Good morning to

20   each of you.  We are still going, sorry.

21             MR. BARRETT:  Dan Barrett, the ACLU Foundation,

22   and our paralegal colleague, Gracie.

23             THE COURT:  Good morning to all of you.  And for

24   the defendant.

25             MS. MCCONAGHY:  Good morning, Your Honor.
```

1    Michelle McConaghy from the United States Attorney's

2    Office, and with me is John Larson from the United States

3    Attorney's Office, for the defendants.

4              THE COURT:  Thank you, both.  Good morning to

5    you.

6              My law clerk today is Attorney Meghan Sullivan.

7    Our courtroom deputy is Diana Mendez and Marquita

8    Peterson.  Thank you for your coverage.  And our court

9    reporter is Catherine Cullen.

10             As always, I remind the court employees and also

11   the parties to please speak up at any time if anything

12   needs to be repeated or if anything is misstated, or if

13   there is anything that is left out.  Don't hesitate to

14   interrupt these proceedings for any of those reasons at

15   any time.

16             Today's hearing is to determine whether the

17   temporary restraining order issued by the Court on

18   April 28 of this year at Docket Entry 17 should convert

19   into a preliminary injunction.

20             There's a pending motion for which the Court is

21   considering a temporary restraining order as to the

22   putative class members, but today's hearing aims to

23   address the separate question of whether the TRO as to the

24   named plaintiffs should be converted into a preliminary

25   injunction.

1          I did see the declaration that was filed by the

2    plaintiffs last night at Exhibit 6 of Docket Entry 29, and

3    the Court's also reviewed the briefs filed by the parties,

4    but does either party anticipate presenting any witnesses

5    or evidence, or do you wish to start with argument?

6          MS. BILDNER:  We do not, Your Honor.

7          MS. MCCONAGHY:  We do not, Your Honor.

8          THE COURT:  Very good.  If everyone is prepared

9    to go forward, I would hear from the plaintiffs first,

10   followed by the defense.  Whenever you are ready, the

11   plaintiffs may proceed with argument.

12         MS. BILDNER:  Wonderful.  Thank you, Your Honor.

13   Good morning.  I'll try to speak slowly and clearly.

14         As you stated, Your Honor, we are here because

15   we believe it's appropriate for this Court to convert the

16   temporary restraining order to a preliminary injunction.

17   Indeed, it's needed.

18         We referenced the current state of the facts in

19   the briefing we filed last night, but I think it bears a

20   quick repeat.  After our named plaintiffs and members of

21   the putative classes, after their SEVIS records were

22   unlawfully terminated - thankfully they have now been

23   reinstated - as far as we know, Mengni and Elika's were

24   reinstated first, and then Yan and Stephen's.  So they are

25   back at school and in their labs and employed, and

1    gratefully so, but much has not changed for them since

2    that time.

3            For one, although we have been told, and of

4    course this Court ordered that their SEVIS records be

5    reactive to the date they were terminated, of course they

6    cannot see that in SEVIS.  Their designated school

7    officials are not able to view that.  Hopefully, it's the

8    case, but we are not able to see that on our end.

9            And the termination information is clearly

10   visible on their SEVIS records.  It says, and in a

11   slightly different wording but not importantly different

12   wording, but they were flagged as a result of a criminal

13   background check and/or visa revocation.

14           This will cause, and easily cause as our

15   declarant Attorney Siscar(ph) explained, many adverse

16   consequences for them down the road, not just with the

17   USCIS, but with other agencies within the Department of

18   Homeland Security.  Particularly, since the wording

19   suggests some kind of nefarious criminal activity, and as

20   far as we know that's not even true for many of them, and

21   at root, Your Honor, the problem today is this harm still

22   exists.

23           The terminations came about overnight with a

24   blatant disregard for the letter of the regulations.  They

25   unleased absolute chaos for these four students, and

1    again, the putative class, barring them taking part in

2    their studies, causing loss of educational opportunity,

3    loss of income, loss of funding, lost internships, lost

4    research times, jeopardizing their ability to graduate, to

5    pursue careers.  And because of that loss, the

6    repercussions continue to follow them today.

7            THE COURT:  Can I stop you there?

8            MS. BILDNER:  Yes.

9            THE COURT:  One thing, when we talk about

10   schooling, even though it's near the end of the academic

11   year when this took place, when we talk about research as

12   to these named plaintiffs, and hypothetically as to other

13   folks in similar situations, might that research be of the

14   nature that that opportunity is gone by the time this gets

15   cleared up?

16           MS. BILDNER:  Very much, Your Honor.  I mean, I

17   really can't underscore the real life consequences this

18   had, even for four weeks at max of a loss of status, or

19   loss of a SEVIS record in defendant's words.  For example,

20   there were plaintiffs scheduled to present their research

21   at conferences.  They couldn't do that because they

22   couldn't work or participate in their research at all.

23   They lost, of course, the research time in their labs.

24   Their experiments, they had to hand them over.  Elika had

25   to hand them over to her colleague and say goodbye to it

1    for now.

2              These are, I mean, these are very real losses

3    for these students, and, most importantly, they are

4    terrified that they will recur if in fact the government

5    decides to attempt a round two.

6              We do appreciate, of course, the one-line

7    statement saying that DHS, defendants have no plans to do

8    that at this time but that--

9              THE COURT:  For this reason.

10             MS. BILDNER:  For this reason.

11             THE COURT:  For only this reason.

12             MS. BILDNER:  Absolutely, for this reason.  I'm

13   not going to say we don't appreciate that; we do.  But

14   it's a very tepid assurance at best, highly equivocal, and

15   gives our students no confidence that this major

16   interruption--

17             THE COURT:  I should clarify.  It was not for

18   this reason; it was on the exact same basis.  So I think

19   that is a more fair statement of defendant's position.  It

20   was that they would not repeat this action on the exact

21   same basis on which they relied as to these named

22   plaintiffs.

23             MS. BILDNER:  Yes, for the same information that

24   was flagged the first time.  And again, our students still

25   don't know, because there's been importantly no

1    justification or even attempt at explanation here of what

2    got them in trouble so-to-speak in the first place.  They

3    can only surmise.

4            So, again, the new policy to which defendants

5    refer, such to the extent it is a policy, it's labeled a

6    broadcast message, really only exacerbates things; it

7    doesn't mitigate them.  It's confusing and it appears to

8    give defendants unlimited discretion, on its face, to

9    revoke visas and then in turn terminate students' SEVIS

10   records.

11           So as numerous courts have held, for all of

12   these reasons an injunction is required here to make sure

13   we are not right back here, God forbid, next week, next

14   month, in the future.  I'll stop there and of course I'm

15   happy to entertain any questions.

16           THE COURT:  If somebody's SEVIS record is

17   terminated, the reality is, at that point the person is

18   immediately unable to continue on in their work or their

19   schooling; is that fair to say?

20           MS. BILDNER:  Yes, Your Honor.  That is our

21   understanding.  And, frankly, it's the defendants as well,

22   because it's what the defendants have on their website.

23           The defendants have tried to create some kind of

24   distinction, and it's truly a philosophical one, between

25   SEVIS records and SEVIS status.  But because the SEVIS

1    record is the authoritative accounting of student status,

2    it's really meaningless to have status.  I put that in air

3    quotes.  It doesn't mean anything if your record has been

4    terminated.  And Judge Underhill in considering this

5    question in another SEVIS student case, said this

6    distinction rings hollow, there can't be much to it, it's

7    somewhat inexplicable.

8         So, yes, our understanding, and again defendants

9    understanding on their website, has been that once your

10   student record is terminated, your school must bar you

11   from doing a number of things, and also you might need to

12   prepare for departure.

13        THE COURT:  And practically that's what happened

14   to the named plaintiffs, right?

15        MS. BILDNER:  That's exactly what happened to

16   the named plaintiffs here.  As soon as they found out from

17   their school officials and the government/defendants made

18   efforts to notify them this had happened, so as soon as

19   their school officials found out and then informed them

20   that their SEVIS records were terminated, they had to stop

21   working.  And absolutely, for PhD students, that means

22   everything toward their degree.

23        For our student, Stephen, who is on OPT, stopped

24   working; can't do anything.  For Elika as well, she was

25   unable to work or do research or teaching assistant;

1    unable to do essentially anything because the schools were

2    trying to obey the letter of the law.  That's what it

3    says.

4            THE COURT:  Do you think that might inform

5    academic institutions and/or employers as to whom they

6    extend these opportunities in the future?

7            MS. BILDNER:  I can speak for our - I can

8    represent for our named plaintiffs that I think there's a

9    lot of fear that they should not be studying here anymore

10   because they can't do what they need to do in this really

11   uncertain environment and this kind of chaos.  I think the

12   waves of that cascaded throughout their universities, to

13   their colleagues as well.

14           THE COURT:  Thank you so much.  I'll hear from

15   the government, please, whenever you are ready.

16           MS. MCCONAGHY:  Thank you, Your Honor.  Good

17   morning, Your Honor.  So, it's the defendant's position

18   that the irreparable harm in this case has ceased at this

19   point as it relates to these four plaintiffs.

20           The complaint seeks a declaration that there's a

21   violation of the APA.  Placing that one pot of relief

22   aside, all other relief sought has been afforded to the

23   four named plaintiffs.  Their SEVIS records have been

24   restored and reinstated retroactively.

25           The defendants have and I have a stronger

1  statement, understanding that the comfort level with the

2  previous statement in the Watson declaration was not

3  enough.  And I can read it into the record: ICE will not

4  under its new SEVIS policy, announced April 26, 2025,

5  re-terminate the plaintiffs' SEVIS records based solely on

6  the National Crime and Information Center records that led

7  to the initial termination or on any related Prudential

8  Visa Revocation that is effective upon departure.

9          So, it's not that it has a plan; ICE is

10  affirmatively representing that the SEVIS records for the

11  plaintiffs that were terminated based on information

12  contained in the NCIC database will no longer be used

13  going forward as the sole basis for termination in SEVIS.

14          Based on plaintiff's submission cited last

15  night, it's important to point out in Exhibits 1, 2, 3 and

16  4, plaintiffs attach a copy of their SEVIS records.  And

17  in those records it notes the date they were terminated

18  and the date they became active.  For all four plaintiffs,

19  the SEVIS records were reactivated prior to the Court's

20  ruling on April 28th on the ex parte TRO.  It didn't take

21  an order from the court for those to be reactivated.

22          THE COURT:  Was there other litigation going on

23  in the country at that time under similar--

24          MS. MCCONAGHY:  Much litigation.

25          THE COURT:  Right.  So this was not just a

1    change in course because, you know, without any

2    intervention and any impending or realized court rulings,

3    right?  It wasn't like the government decided on its own,

4    hey look, what we did was either illegal, immoral,

5    ineffective?  There were some precipitating events that

6    led to this change in course; no?

7        MS. MCCONAGHY:  That leading to the change in

8    the policy of the defendants, Your Honor.  But it wasn't

9    specifically this Court's ex parte TRO.

10        THE COURT:  Sure.

11        MS. MCCONAGHY:  And going back to the remedies

12    sought, I mean, as it relates to the SEVIS records, that's

13    all that is sought in the complaint.  The fact that that

14    relief has already been afforded to the plaintiffs, I

15    think, indicates that immediate irreparable harm, which is

16    an extraordinary burden and remedy, doesn't exist.

17        Unless the Court has further questions from the

18    government...

19        THE COURT:  I'll start just piggybacking on part

20    of the defendant's argument.  What was the reason for the

21    SEVIS records being terminated in the first place?  What

22    was the policy reasoning behind that?

23        MS. MCCONAGHY:  All I can tell the Court is what

24    I've read from other litigation.  I don't have any

25    firsthand knowledge of this and this was not conveyed to

1    me by anybody with the defendants.  But it seems that ICE

2    through SEVIS, in comparing SEVIS with the NCIC database,

3    determined that a list of individuals should be sent to

4    the state department for a determination based on their

5    interaction with law enforcement if they should maintain

6    their visas.  That's not a determination to be made by any

7    of the defendants in this litigation.  And based on that,

8    the state department made its decisions and sent the list

9    back to ICE, and that's when SEVIS records were

10   terminated.

11         THE COURT:  So what then was the reason for the

12   change in policy?

13         MS. MCCONAGHY:  I'm not at that level to know,

14   Your Honor.

15         THE COURT:  Would any of that be relevant to

16   determining whether the plaintiffs reasonably should be

17   able to rest easy?

18         MS. MCCONAGHY:  It might be very determinative

19   to the fact of whether the defendants actions were

20   arbitrary and capricious under the APA.  But I don't think

21   it goes to irreparable harm if the defendants are stating

22   "we have reinstated you retroactively and we will not use

23   NCIC as a basis going forward".

24         THE COURT:  Well, you will only use NCIC, right?

25         MS. MCCONAGHY:  We won't use NCIC to terminate

1    SEVIS records going forward.

2              THE COURT:  Is that what the policy says?

3              MS. MCCONAGHY:  This is the representation

4    stipulation that the defendants authorized me to make.

5              THE COURT:  It says that they won't, that the

6    government won't use the NCIC data?

7              MS. MCCONAGHY:  Correct, Your Honor.  And I'll

8    read it again.  "ICE will not under its new SEVIS policy,

9    announced April 26th, re-terminate the plaintiffs' SEVIS

10   records based solely on NCIC records."

11             THE COURT:  So based solely on the NCIC records,

12   right?  So that word "solely" is pretty important, right?

13   It's not saying you are going to ignore the NCIC data, and

14   perhaps you shouldn't have to be forced to set it aside,

15   but that word "solely" is pretty important, right.  So

16   it's not saying you are not going to use that as part of

17   the basis going forward.

18             MS. MCCONAGHY:  Correct.  I think the claims of

19   the plaintiffs in this case is that is the only

20   information as to why they could have been terminated;

21   there's nothing else in their record.

22             So going forward, for example, say John Doe

23   commits a murder tonight and he has an active SEVIS

24   record, he's going to be in NCIC, and I guarantee you he's

25   going to be terminated.  I think that's the difference,

1    right.  There's some other underlying reason as to why the

2    record is terminated.

3         THE COURT:  If somebody's SEVIS record is

4    terminated - first, let me ask the question I asked of

5    plaintiffs.  Is it the defendant's understanding when

6    somebody's SEVIS record is terminated, the reality is they

7    must stop working or going to school immediately?

8         MS. MCCONAGHY:  No, not correct, Your Honor.  I

9    do agree that I believe they do have to stop working.  But

10   I know for a fact there are schools in Connecticut that

11   have allowed students with SEVIS records to continue going

12   to school.

13        THE COURT:  Okay.  The government in its

14   briefing made the distinction between terminating

15   somebody's SEVIS records and the difference between that

16   and the impact on F-1 visas.

17        MS. MCCONAGHY:  The nonimmigrant visa status,

18   Your Honor.

19        THE COURT:  Yes.  Can you explain the impact of

20   terminating someone's SEVIS records on their F-1 status?

21        MS. MCCONAGHY:  It's quite the opposite, Your

22   Honor.  So the F-1 status was terminated prior to the

23   SEVIS record being terminated.  The decisions are made by

24   two very distinct agencies.  An F-1 visa is issued by the

25   Department of State or the United States Citizenship and

1    Immigration Services.  And SEVIS is maintained by the

2    Department of Homeland Security, I believe, through ICE in

3    the schools themselves.

4            If a person's SEVIS record is terminated, it

5    doesn't automatically stand that their visa has been

6    revoked.  And we know that to be the case, because in this

7    instance Plaintiff Du has an active visa; his visa was

8    never revoked.

9            And then we have two different types of ways a

10   visa can be revoked.  It can be Prudential, which means

11   Prudential or immediate.  An immediate revocation is, the

12   revocation dates back all the way to the issuance of the

13   visa so it's as if the person was never in the United

14   States lawfully.

15           A Prudential revocation doesn't date back all

16   the way to the date of the issuance.  And the only effect

17   that a Prudential revocation is important is when you

18   leave the country to re-enter.  Before you leave the

19   country and re-enter, that entire time you are here you

20   are not obtaining an unlawful presence; you are here

21   legally and you have nonimmigrant visa status.

22           THE COURT:  So if your SEVIS record is

23   terminated - the F-1 status isn't forever, right?

24           MS. MCCONAGHY:  For duration of status, how long

25   you are allowed to stay here, correct.

1          THE COURT:  So if the SEVIS termination goes

2     into effect, what's the impact on the F-1 status when that

3     visa expires?

4          MS. MCCONAGHY:  There is no, because as long as

5     you don't leave the United States, you stay in

6     nonimmigrant lawful status.  So, for example--

7          THE COURT:  So if somebody's SEVIS record is

8     terminated, their F-1 visa expires, they are still allowed

9     to lawfully remain and can't be deported?

10         MS. MCCONAGHY:  Example:  Plaintiff Shams and

11    Plaintiff He both have expired F-1 visas.  For Plaintiff

12    Shams, it expired on 1-22-24, well before the events

13    leading to this litigation.  And for Plaintiff He, it

14    expired on June 28, 2021.  So He has been here in the

15    United States over three years on nonimmigrant visa status

16    without having an active F-1 visa.

17         THE COURT:  And defendant's position is that

18    somebody can't be deported on that basis?

19         MS. MCCONAGHY:  Correct, on a Prudential

20    revocation.  It's the government's position that is not a

21    ground for deportation.

22         THE COURT:  And so what if somebody in that

23    status fears that they might be deported for that reason

24    and so they voluntarily leave the country thinking, "hey,

25    I'll leave until this gets sorted out"?  Would that person

1    be allowed to return to the country once their F-1 visa

2    status has expired and their SEVIS records have been

3    terminated?  Would they be allowed to--

4              MS. MCCONAGHY:  They can reapply for entry.

5              THE COURT:  They can reapply.

6              MS. MCCONAGHY:  Correct.  Just as if a person's

7    status, the duration of status expired, and they left and

8    decided they want to re-enter a new school here in the

9    United States, they would have to reapply.  And their

10   SEVIS record may have been terminated because they were no

11   longer here, but it could be reactivated again.

12             There's another point I would like to make, Your

13   Honor, and I know I referenced it, but I have the specific

14   language which I'm happy to hand to the Court.  It was

15   filed in a different case, in the District of Columbia,

16   and it's one thing that I think very validly plaintiffs

17   were concerned about; is what happens when they seek these

18   new benefits going forward in the future.

19             And a letter, it is our understanding, that the

20   defendants intend to send a letter to all students whose

21   SEVIS records were Prudentially revoked.  And the letter,

22   the purpose of the letter and the intent of the letter,

23   was so that students can use this and present it in the

24   future when seeking future, any immigration going forward,

25   to show that although because of software issues, and

1    that's all it is, is software issues of why they can't

2    eliminate that termination flag, that there's actually no

3    gap in their record.

4           THE COURT:  Going back to my hypothetical.  If

5    somebody learned that their SEVIS record was terminated,

6    they feared that they might be subject to the deportation

7    because they now can't work, their F-1 visa, say it was

8    expiring or did expire and they left the country.  And

9    then defendants took corrective action, but the person who

10   voluntarily left having not been able to continue working,

11   they may have lost their housing in the meantime, they

12   might have lost that opportunity depending on how long it

13   takes for this corrective action to go into effect.  If

14   that person can't afford to come back, to make their way

15   back into the country, should that be viewed as

16   irreparable harm?  Or is there any scenario in which the

17   defendants would consider irreparable harm to have flowed

18   from this decision?

19          MS. MCCONAGHY:  First, I would argue that's

20   speculative as to what could happen in the future.  That

21   isn't what is irreparable harm and the immediate nature of

22   it that a preliminary injunction envisions.

23          Again, I don't think that's a remedy that could

24   be fixed under an APA jurisdictional type case, because as

25   well as any future damages, I'm not sure that's a remedy

1    that can be afforded under the APA.

2            And there's one other point I want to point out.

3    In order to be eligible to come here on an F-1 visa, the

4    student has to maintain that they are self-sufficient and

5    do not need to work while they are in the United States in

6    order to maintain that nonimmigrant student status.

7            THE COURT:  Were the named plaintiffs in this

8    case given any advance notice before the SEVIS record was

9    terminated?

10            MS. MCCONAGHY:  That I would have to ask

11    plaintiffs.

12            THE COURT:  Normally, does somebody have the

13    opportunity to challenge that action in advance?  Or they

14    just learn of it once it has gone into effect?

15            MS. MCCONAGHY:  I don't know the answer to that

16    either.

17            THE COURT:  Anything else from defendants at

18    this time?

19            MS. MCCONAGHY:  No, Your Honor.

20            THE COURT:  Thank you.  Does plaintiff want to

21    be heard?

22            MS. BILDNER:  I would love to respond to a few

23    points.  First, I think it will help us for clarity

24    purposes to distinguish between among three things.  One

25    is a visa, an F-1 visa in this case.  The second is F-1

1    student status.  And the third is a SEVIS record.

2          In the discussion that Your Honor had with my

3    opposing counsel, I want to be clear, those are three

4    separate things; not two.  So, yes, it is true that of our

5    four students, two of them had expired visas, two had

6    current visas; however, that is separate and apart from

7    their F-1 student status as indicated in SEVIS.

8          So Mengni had an expired visa.  She had not

9    returned to her home country for a while; she was studying

10    here.  But once her student status was terminated, as

11    evidenced by the SEVIS record saying terminated, the

12    following happens.  And I'm quoting this from DHS's own

13    website, "student loses all on and/or off-campus

14    employment authorization and this is a motion for TRO".

15          THE COURT:  So this is when an F-1 status is

16    lost?

17          MS. BILDNER:  It says when an F-1/M1 SEVIS

18    record is terminated the following happens.  And then it

19    details everything that comes with losing your status.

20    And again, for us, there's no distinction between the

21    record and the status.  The visas, again, is a third

22    separate thing.  But the record and the status are the

23    same, because once Mengni's status was terminated in

24    SEVIS, as evidenced by her SEVIS record saying terminated,

25    she lost all of her employment authorization.  And she is

1    a PhD student who is researching in a lab, so her entire

2    educational trajectory at the moment is her research,

3    which is considered "work"; therefore she could not do it.

4            She could also, and this is from what DHS tells

5    us, she can't re-enter on the terminated SEVIS record.

6    Third, Immigration and Customs Enforcement, ICE agents,

7    may investigate to confirm the departure of the student.

8    Again, those are very chilling words for a PhD student

9    studying here.

10            And, lastly, any associated F2 or M2 dependent

11    records are terminated.  That's not an issue here.  So the

12    loss of the record carries with it the loss of the status

13    is what I'm saying.  There's no daylight between those

14    two.  When Mengni and Yan and Stephen and Elika's status

15    said terminated in SEVIS; they couldn't do these things.

16            I would like to respond to two other points.

17    One is just to say, Your Honor asked some questions; is

18    this the normal course or what would happen in the normal

19    course.  I can not emphasize how backwards this was.  As

20    we described, there's seven reasons writ large that

21    someone's student status may be terminated.  Three of

22    them, defendants can do unilaterally.  It's very clear

23    none of those have any bearing on this case.  Those are 8

24    CFR, Section 214.1D.  None of those have anything to do

25    with us.  One of those is a private bill to confer

1    permanent resident status on such alien by the congress.

2    So those three reasons, those unilateral reasons, not an

3    issue here.

4          The four other reasons.  If a student fails to

5    do something, a student status can be terminated.  And

6    there are four reasons for that.  Normally, a school would

7    become aware of those reasons, inform defendants.  And the

8    school has a drop down menu to terminate status for those

9    reasons.

10          Those reasons are if someone had failed to make

11    normal progress towards completing their course of study.

12    That's 8 CFR 214.2(f)(5).  If someone had undertaken

13    unauthorized employment, 214.1(e).  If someone had

14    willfully failed to provide full and truthful information

15    requested by DHS, 214.1(f).  And I've lost my last reason.

16    Sorry, this is the only criminal-related reason; if

17    someone had been convicted.  Again, convicted in the

18    United States for a crime of violence for which a sentence

19    of more than one-year imprisonment may be imposed.  That's

20    214.1(g).

21          Those are the reasons.  And, again, normally a

22    school would find out about something in that list, go and

23    get in touch with the appropriate officials, and then

24    terminate a student's status.  Everything here happened,

25    not just outside of these regulations, but backwards;

1    because the defendants took it upon themselves to go ahead

2    in the drop down menu, as though they were a school

3    official, and terminate people's statuses for 'and other'

4    reasons.  So again, this is not how things normally work.

5    I can't emphasize that enough.

6             The policy - this is my last point - the policy

7    that we have been referring to, we put it into the record.

8    And in general, Your Honor, the lack of information here

9    is a big part of the problem, so we had to refer to

10   filings in other cases to figure out and surmise what

11   happened here.

12            The policy expressly disclaims that anyone may

13   rely on it.  So not only does it not provide any added

14   assurance, it exacerbates the issue.  One of the reasons

15   it suggests is sufficient for terminating SEVIS records is

16   United States Department of State visa revocation

17   effective immediately.  And that, of course, has terrified

18   our students, because that's not - visa revocation has

19   been separate and apart from a SEVIS status.

20            Again, we have been forced to guess and surmise

21   here just what is happening.  We don't actually know if

22   any of the students who got terminated, got terminated

23   because of their NCIC information or what it was in that

24   database.  We are purely guessing at this point and we

25   have offered our best sense of what happened.  We may have

1    guessed wrong.  Discovery, of course, would clear that up.

2            THE COURT:  Does defense want to address that

3    last point?

4            MS. MCCONAGHY:  Yes, quickly, Your Honor.  We

5    are talking about harms in the past.  Again, preliminary

6    injunction shouldn't be based on past conduct if there's

7    been assurances to show that that harm is not continuing

8    should the Court find such.

9            I hear plaintiff's counsel when they talk about

10   three very different statuses.  But there's no such thing

11   as an F-1 student status.  It's an F-1 nonimmigrant

12   status.  A SEVIS record is something very distinct, and

13   the F-1 visa is the actual travel document.

14           You come in on an F-1 visa.  That's your travel

15   document to get into the United States.  Once you are here

16   on that travel document, you have F-1 nonimmigrant status.

17   That does not change even if your SEVIS record is

18   terminated.  And we know that, because it has not changed

19   for any of the plaintiffs in this case.  And two of them,

20   all of them at one point, had their SEVIS records

21   terminated and reactivated.

22           I don't think I have any other points to make

23   unless the Court has further questions in response to what

24   plaintiffs just argued.

25           THE COURT:  Thank you, counsel.  For plaintiffs,

1    any response to that point, that once somebody is here

2    they have attained their F-1 nonimmigrant status, and that

3    doesn't change even if their SEVIS record has been

4    terminated?  Do you want to be heard on that?  Or on the

5    previous point that someone in these plaintiffs' positions

6    would never have been at risk of deportation?

7              MS. BILDNER:  I'll defer to my colleague.

8              MR. LLINAS:  Three quick points.  First off, you

9    have heard mention of Prudential revocation.  You can find

10   those at 9 FAM 403.11, specifically, Subsection (5)(b).

11   Those regulations deal with the extent to which the State

12   Department can - or it does have the discretionary power

13   to Prudentially revoke a nonimmigrant visa holder's visa,

14   such as an F-1 visa, for a criminal arrest.  Okay.  And

15   it's just for the arrest; it doesn't matter how the

16   charges are resolved.

17             When I have such people come in my office, I'm

18   like "look, the State Department may revoke your visa

19   prudentially.  You will be able to stay through the

20   expiration of your visa, but you can't go home.  Because

21   if you go home and try to come back, you will not be able

22   to return, okay".

23             Second, as my colleague noted for you, the only

24   criminal grounds for termination of a SEVIS record lies at

25   8 CFR 214.1(g), and it's conviction of a crime of violence

1    as defined by federal law with a sentence of a year or

2    more.

3           And, finally, I want to speak to the issue of

4    ongoing irreparable harm and I want to make this clear

5    specific point.  It's noted in our most recent declaration

6    from Anna Siscar, the impact of the negative entry on the

7    SEVIS record, which the defendants' attorneys certainly

8    note.  They are saying the correction of it is retroactive

9    to the date of the termination.  But they mention that

10   software issues preclude the defendants from vacating that

11   and removing it from the record entirely.  And that's the

12   issue here, because the impact of that negative entry on

13   the SEVIS record could impact two things.

14          First off, the USCIS's review of that

15   nonimmigrant visa holder's application for future benefits

16   before USCIS, like transferal to another nonimmigrant

17   application for adjustment of status, to get a green card

18   application for OPT or STEM OPT, which is like work after

19   an F-1 visa.

20          And what is interesting in those circumstances

21   is when an applicant is before a USCIS officer, their

22   credibility is at issue.  And they absolutely must be

23   truthful, because if the USCIS officer determines them not

24   to be, then that can have a negative credibility

25   determination and ultimately result in the denial of

1    whatever benefit they are seeking.  And that puts them in

2    the position where like "hey, my SEVIS record was

3    unlawfully terminated, the government fixed it, but for

4    some reason that termination still sits on my record, an

5    entry of termination sits on my SEVIS record".  So, they

6    are stuck in that difficult position having to admit to a

7    termination on their SEVIS record that was unlawful and

8    corrected.

9         THE COURT:  Is this something that happens in

10   person?  Or would there first be some sort of online

11   application or a letter--

12        MR. LLINAS:  There's an application and an

13   interview.  In USCIS, you put in the application, and they

14   go through the initial processing of it and there's an

15   interview.

16        THE COURT:  Is that application done online?

17   I'm asking--

18        MR. LLINAS:  Some applications before USCIS can

19   be filed online through an USCIS online account.  Others

20   cannot.  Even within certain ranges of, for example,

21   certain adjustment of status applications to seek a green

22   card, some applicants can apply online.  Others have to

23   apply through paper.  It just depends.  Like, someone who

24   has been granted special immigrant juvenile status and

25   then their date comes due, so they can apply for their

1    green card, they have to apply through paper, through the

2    mail, whereas a person getting status through marriage or

3    family can do so online.  Same with employment

4    authorization document; some can file online, some have to

5    file through the mail.

6         THE COURT:  The reason I ask that, to the

7    government's point about having this letter of

8    explanation, why is that not a viable curative function;

9    that can this applicant not just present that letter?

10   They might be fearing even criminal prosecution for giving

11   a false statement, but if they have that letter, shouldn't

12   that be enough?

13        MR. LLINAS:  It depends upon the discretion of

14   the officer at issue.  And, second, I'm not sure that any

15   of our folks have received promise letters detailing those

16   issues.  So we are kind of in a stuck position at that

17   point.  So, at this point, we have that ongoing potential

18   of harm.

19        Last, we have the impact of the negative SEVIS

20   entry upon a person's reentry to the United States through

21   Customs and Border Patrol.  A customs agent seeing that

22   negative SEVIS record may well deny that person entry

23   because they see an entry of termination on their SEVIS

24   record.  It's like to equate it to what happens here in

25   Connecticut; an immigrant goes to DMV to get a license,

1    and that frontline DMV worker, just like the frontline

2    USCIS adjudicator or that frontline Border and Customs

3    Patrol Agent doesn't have the legal understandings that we

4    all have, and often times will make a spot decision based

5    on what they see and deny.  I run into this a lot.

6             THE COURT:  And the person made their way all

7    the way here.

8             MR. LLINAS:  I do this all the time.  I call the

9    DMV and say we have this issue.  And I get them all the

10   documentation and they set up a new appointment, and the

11   person gets granted the driver's license or drive-only

12   license they should have received in the first place.

13            But just that speaks to the issue of what we

14   have going on here does not sufficiently correct or

15   protect the named plaintiffs here at issue because there

16   is the ongoing harm that exists because of the negative

17   entry on their SEVIS record; even though it's been

18   corrected and noted to be retroactive, the retroactive

19   corrections do not remove that negative SEVIS termination

20   entry.  And until there's a way to fix that, our clients

21   remain facing irreparable harm.

22            THE COURT:  Thank you, counsel.  Can I ask if

23   there is any response from the government as to - well,

24   can the government state whether these, how you term them

25   the curative explanation letters, have those gone out to

1    the named plaintiffs in this case?

2             MS. MCCONAGHY:  I have not checked with respect

3    to the named plaintiffs, and I know they are in the

4    process of sending these letters out.  I can inquire as

5    soon as I get back to the office if the named plaintiffs'

6    letters have gone out.

7             THE COURT:  I'm looking through my notes to see

8    if there are questions that have not been answered by the

9    parties.  I'll give you the chance to do the same, if you

10   feel you wanted to say something but didn't get to.

11            One question I have for the government, and I

12   still perhaps don't understand, if the end goal was not to

13   take steps toward deportation of these named plaintiffs,

14   what would be the purpose of terminating these SEVIS

15   records?

16            MS. MCCONAGHY:  My guess, Your Honor, and I have

17   this from the agency; because you maintain your status for

18   the duration of your stay, it would be if a person had an

19   encounter with law enforcement that they then thought this

20   person shouldn't be readmitted as a student in the future,

21   it would be my guess, for future applications, if they

22   remain terminated.  But I don't know that for a fact and I

23   probability shouldn't speculate, Your Honor.

24            THE COURT:  Do plaintiffs want to be heard based

25   on the Court's question?

1            MS. BILDNER:  Just to reiterate that this is

2    such a guessing game and it's really unfair, I think, to

3    our student plaintiffs to be in this position.  Yan, for

4    example, could not even think of a possible entry of any

5    kind, encounter with law enforcement of any kind, that she

6    has had.  So she simply didn't know why she would come up

7    in a NCIC background check; she is left scratching her

8    head, and that underscores the real threat here.

9            Again, curative actions, aside for that

10   repercussion for what has already happened, there's a

11   threat of reoccurrence here.  Under a Watson statement,

12   the similar, perhaps slightly stronger statement that

13   counsel read into the record, are not enough to ensure

14   that this kind of extra legal action doesn't happen again

15   without the force of an injunction behind it.

16           THE COURT:  So she is saying she doesn't know

17   how this came up in the first place.  The government's

18   response, essentially, is that we still can't get to

19   irreparable harm because there's no threat of deportation

20   in that instance.  Then, where is the irreparable harm?

21           MS. BILDNER:  The irreparable harm is a long

22   list here, separate and apart from the government's own

23   words, that once a SEVIS record is terminated, ICE agents

24   may investigate to confirm the departure of the student;

25   which seems there's a strong implication there that they

1    should get themselves out of here.

2            Aside from that, again, loss of educational

3    opportunity, loss of time invested in their degree

4    programs and trying to do their research, loss of funding,

5    because again, PhD students of the kinds that are named

6    plaintiffs here, biomedical engineering and the like, must

7    do their research, which is work, in order to complete and

8    publish, in order to complete their PhDs.

9            Of course, the uncertainty of living with

10   whatever was going on with their status, our students were

11   leaving their homes and essentially trying to hide for the

12   duration of this.  Yes, some of them could go to class,

13   but again, they couldn't participate in their programs the

14   way they needed to, and that in turn would force them out

15   of compliance with their status.

16           So in a sense, the government's actions here

17   were forcing them.  Since they were truly not doing

18   nothing wrong and yet they were being forced out of

19   compliance with their programs, and now all four students

20   are living with this terminated record on their SEVIS

21   records; it's still there and no one has gotten any

22   letters in the mail.  We don't know what they will say if

23   they do get those letters.  But again, in these

24   interactions with future CBP, USCIS, other people who have

25   access to the SEVIS records, we truly have no idea what

1    they will make of this derogatory information, that the

2    students are then left to try to explain and they truly

3    don't know how to explain it either.  All of that, I

4    think, Your Honor, and the threat of reoccurrence at root,

5    leads to irreparable harm here.

6                THE COURT:  Anything else from the government?

7                MS. MCCONAGHY:  Yes, Your Honor.  Every single

8    item that plaintiff counsel just listed talks about past;

9    lapse of education, time invested, loss of funding,

10   uncertainty about leaving the house, potentially being

11   forced out of compliance, all past.

12               They are reinstated, reinstated retroactively.

13   There's been a representation for these plaintiffs that

14   they will not be terminated in SEVIS based on any NCIC

15   records.

16               And for the benefit of plaintiff's counsel,

17   since they said they don't know what the letter says, I

18   can read it into the record if the Court wants or I can

19   offer up what was filed in the District of Columbia,

20   because we expect the language to be submitted to the

21   Court in the District of Columbia.

22               THE COURT:  Thank you.  I thank you all for the

23   clarity you have provided through your arguments.

24   Anything else that anyone wants to add to what you have

25   briefed?

1          MS. MCCONAGHY:  May I offer a copy of what was

2    filed with the District of Columbia that plaintiffs will

3    be receiving in the mail?  And I have to copy to provide

4    to plaintiff's counsel.

5          THE COURT:  Sure.  You may approach.  Thank you,

6    counsel.  For clarity, is this something defendants intend

7    to docket?

8          MS. MCCONAGHY:  You can take judicial notice as

9    it's filed in the District of Columbia, but I can

10   certainly do so.

11         THE COURT:  For anything that I consider in a

12   ruling, I like to have a record of that just so the public

13   is aware of what the Court considered.

14         MS. MCCONAGHY:  In that notice I'll certainly

15   include the language that ICE has authorized me to state

16   with respect to its future intentions.

17         THE COURT:  Sure.

18         MS. MCCONAGHY:  Thank you, Your Honor.

19         THE COURT:  Thank you, counsel.

20         MS. BILDNER:  Your Honor, I'll note for docket

21   purposes, there's nothing on the docket currently.  Again,

22   counsel represented that they have been restored

23   retroactively.  We can't see that on our end.  Since they

24   did not file the Hick's declaration or a similar

25   declaration saying this is not visible externally, I'll

1    note there's nothing on the docket saying why we can't see

2    it on our student's records any indication of

3    retroactivity.

4            And separate and apart from that, just a

5    housekeeping matter I want to raise briefly.  And I

6    apologize for this, we realized we missed a birthdate

7    redaction.  We will correct that immediately and just file

8    the whole thing corrected.  So when you see that, please,

9    nobody panic.

10            THE COURT:  Thank you for catching that.

11            MS. BILDNER:  Thank you.

12            THE COURT:  Thank you for that.  Anything else

13   from plaintiffs at this time?

14            MS. BILDNER:  No, Your Honor.  Thank you for

15   hearing us.

16            THE COURT:  Anything else from defendant?

17            MS. MCCONAGHY:  No, Your Honor.  Thank you.

18            THE COURT:  Thank you for entertaining the

19   Court's questions and the briefing.  That was very helpful

20   to the Court.  In the meantime, the Court has enough to

21   render a ruling, but I will take some time to still

22   consider and reflect on the arguments that were made today

23   in addition to what you have docketed.

24            But in the meantime, the Court will order that

25   the terms of the temporary restraining order docketed at

1    Docket Entry 17, those shall remain in full effect until

2    the Court issues a ruling on the motion for preliminary

3    injunction.

4            Federal Rule of Civil Procedure 65(b)(2),

5    provides that a temporary restraining order expires at the

6    time after entry not to exceed 14 days that the Court

7    sets, unless before that time the Court for good cause

8    extends it for a like period or the adverse party consents

9    to a longer extension, and the reasons for that extension

10   have to be entered on the record.

11           Here, there's good cause for an extension of the

12   temporary restraining order until the Court issues its

13   written ruling on the preliminary injunction motion,

14   because first, the expedited briefing that was ordered by

15   the Court, the Court still wants to review it and consider

16   the oral arguments made on the record today.

17           So the Court will take that opportunity,

18   although it does intend to rule in the near future, and I

19   thank the parties for your arguments, both on the record

20   and in your briefs, and the additional materials provided

21   today.

22           And I thank you all.  With that, anything else?

23   Thank you, all.  The Court stands adjourned.

24           COURTROOM DEPUTY:  All rise.  The Honorable

25   United States District Court for the District of

1    Connecticut is now adjourned.

2              (Adjourned at 11:03 a.m.)

3

4

5                    C E R T I F I C A T E

6

7

8              I, Catherine Cullen, Official Court Reporter for

9    the United States District Court for the District of

10   Connecticut, do hereby certify that the foregoing pages

11   are a true and accurate transcription of my shorthand

12   notes taken in the aforementioned matter to the best of my

13   skill and ability.

14

15

16

17

18                        /S/ CATHERINE CULLEN
                          _____
19                        Catherine Cullen
                          Official Court Reporter
20                        450 Main Street
                          Hartford, CT  06103
21                        (914) 552-3201

22

23

24

25